FILED

2007 Sep-28  PM 12:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NICHOLAS BRYAN and )
LORI BRYAN, )
 )
Plaintiffs, )
 )                2:05-cv-1945-TMP
v. )         Case No. 2:05-cv-1945-TMP
CITY OF GARDENDALE, *et al.*, )
 )
Defendants. )

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed on January 5, 2007, by the defendants, the City of Gardendale and Officers Daryl Sutton, C.H. Davis, and E.J. Fann (Doc. 19). Defendants seek dismissal of all of plaintiffs' claims on the basis of immunities and other grounds. A supplement to the motion was filed July 17, 2007 (Doc. 24), to which the plaintiffs responded (Doc. 26). This matter has been fully briefed. The court has considered the evidence and the arguments set forth by both parties. The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) (Doc. 7); accordingly, the court submits this memorandum opinion.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify

which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

Pertinent to this case also is the fact that there is a police dashboard video of much, but not all, of the events involved in this action.  There is no audio, however, only video of the scene, so it is not possible to make out what is being said or in what tone.  The recent Supreme Court case of Scott v Harris, ___ U.S. ___, 127 S. Ct.  1769, 167 L. Ed. 2d 686 (2007), sheds some light on how this video is to be treated in the summary judgment context.  There, the Court explained that the trial courts must take into account the plain recording of events captured on a video.  The Court opined:

> The first step in assessing the constitutionality of Scott's actions is to determine the relevant facts. As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and respondent's version of events (unsurprisingly) differs substantially from Scott's version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); Saucier, supra, at 201, 121 S.Ct. 2151. In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts.
>
> There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals.
>
> * * *
>
> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

4

requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

<u>Id.</u> at ___, 127 S. Ct. at 1774-1776 (italics in original).

## FACTS

Applying these standards and teaching to the evidence in this case, the following facts appear to be undisputed or, if disputed, taken in a light most favorable to the non-moving plaintiffs. The court also has viewed the video several times, and has taken it into account in the descriptions of events given below. To the extent that some description of the events given by the parties is flatly and clearly contradicted by the video, such description fails to create a "genuine" issue of fact. <u>See</u> <u>Scott v Harris</u>, ___ U.S. ___, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court has attempted to fairly and neutrally describe what is shown on the video, but certainly the video can speak for itself.

Plaintiffs Nicholas and Lori Bryan brought this action seeking money damages and attorneys fees pursuant to 42 U.S.C. § 1983 and Alabama state law, contending that the defendants unlawfully used excessive force in the course of arrests, in violation of their rights under the Fourth Amendment, and that the defendants are liable for civil assault and battery, false arrest, false

5

imprisonment, and the tort of outrage.  For purposes of determining the merits of defendants' motion for summary judgment, the court views the facts in the light most favorable to the non-movants and considers the following facts to be undisputed:

On May 12, 2005, the plaintiffs were at a hair salon in Gardendale, Alabama, preparing the salon for a grand opening scheduled for the following day.  The salon was owned by plaintiff, Lori Bryan.  It was night, and at about 8:30 p.m., plaintiff Nicholas Bryan[1] was preparing to mow grass and trim shrubs around the salon building.  Nicholas and Lori are husband and wife.  Plaintiff Nicholas Bryan's brother and another man were driving toward the salon in a pickup truck, carrying lawn mowers and weed trimmers to be used at the salon.  Gardendale Police Officer Daryl Sutton was behind the truck in a police vehicle, with the blue lights flashing, attempting to make a traffic stop because he observed that the truck had only one tail light and no tag light.  The truck pulled into the salon parking area, and Sutton pulled in behind the truck.  The police vehicle had a dashboard video camera, which automatically began to record when the blue lights were turned on.  Sutton did not turn on his microphone, however, and there is no audio on the video recording.[2]

---

[1]      To keep the facts clear, the court will refer to the plaintiffs as Lori and Nicholas.

[2]      There is some confusion among the parties and, indeed, on the part of the court, as to what consideration may or must be given to the videotape.  The plaintiffs repeatedly cite to the video, asserting that it proves, for example, that Nicholas was "passive" when Officer Sutton first addressed him.  The defendants assert, to the contrary, that he was verbally and physically threatening from the beginning.  Because there is no audio, the videotape does not definitively resolve that question.  Even so, the plaintiffs' version of that fact must be accepted as true here, and the court is not to engage in determining the credibility of the plaintiffs.  The court is mindful, however, that there apparently are times when the court may completely discount a non-movant's version of the events, if that version is "blatantly contradicted by the record," as presented through a videotape.  Scott v. Harris, ___ U.S. ___, ___, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  In Scott, the non-movant alleged that a police chase took place in an area where there was no threat to pedestrians or other motorists, and that he remained in control of his vehicle at all times.  The

6

When the truck stopped, Nicholas walked from the salon to the truck bed and removed a lawnmower and a weed-trimmer.  Sutton began to yell at him, told him to stop what he was doing, and ordered him to get over to the truck, and "get on the hood."  Sutton was screaming and cursing, but, on the video, Nicholas appears to disregard Officer Sutton's command, and walks back toward the salon with the mower and weed-eater.  He did not respond to Sutton because he felt Sutton had a "poor attitude."  He did not follow Sutton's orders, and told Sutton that he hadn't done anything wrong.

A group of plaintiffs' friends and family members gathered in the parking lot near the truck and patrol car.[3]  Officer Sutton followed Nicholas, grabbed Nicholas's shirt, and pulled him back towards the police vehicle, ripping his clothes.  Sutton continued to tell Nicholas to go over to the police vehicle, but he did not comply.  Lori approached Sutton with the truck's title in her hands.  Sutton told her: "Get the fuck out of my face or I will mace you."  Nicholas's mother also was present, and asked Sutton what was going on.  Sutton told her she needed to shut up and stay out of it, and that he would mace her if she didn't get out of his face.

Plaintiff Lori Bryan described the confrontation this way:

---

videotape apparently showed the car traveling "shockingly fast," crossing the double-yellow line, and forcing cars onto the shoulders to avoid being hit.  Although a majority of the Supreme Court found the chase to be sufficiently scary to discount the plaintiff's story, at least one justice noted that the events depicted on the videotape could be subject to interpretation.  See, 127 S. Ct. at 1781 (J. Stevens, dissenting).  The same may well se said of the video in the instant case.  Nonetheless, the court must consider what is depicted on the video in determining whether there are "genuine" issues of fact.

[3]     Witnesses' testimony about the number of people who gathered near the scene vary from about 5 to about 20.  It is clear, however, that aside from officers, Mr. and Mrs. Bryan and the truck driver and passenger, Mr. Bryan's mother was present, as was Mrs. Bryan's mother, a toddler, Deputy Underwood, and Underwood's wife.

Q. Had you heard any previous conversations between your husband and Officer Sutton before you went over there?

A. When I was walking to my car, Sutton had told Nick to go to the hood of the car. Nick said, you know, what did I do, and Officer Sutton said that he didn't have to tell him what he did, he needed to go over to the trunk of the car. Nick said, I will gladly walk over there if you will tell me what I done. And he said, I don't have to tell you what the F you done, you will do what I tell you to do.

Then that's when I walked to him and tried to hand it [title papers to the truck] to him, and that's when he said you need to get the F out of my face before I mace you.

Q. That's all you heard?

A. Huh-huh, yes, sir.

* * *

Q. What did you hear in the conversation between Nick and Sutton?

A. I heard Sutton tell Nick to go to the front of the vehicle, and Nick said, I'll gladly go when you tell me what I done wrong.

Q. Were they yelling at each other?

A. It was escalating up to that. They wasn't --

Q. And what happened after that conversation?

A. That's when I tried to give Sutton the paperwork to the truck.

* * *

Q. What did you hear Sutton or Nick say as you approached them once you got the title and the bill of sale?

A. There wasn't -- neither one of them were saying anything.

Q. They were just staring at each other?

8

A. He was trying to pull Nick backwards. His mom had walked out and got in between them and was telling Nick to just be quiet, don't say nothing, just go on and do what he says to do.

Q. Sutton was trying to pull Nick back to his car?

A. Yes.

Q. How was he trying to pull him back?

A. He had him by the -- on the back of his overalls how they come back, I guess it's like the T-part of it, he had that grabbed and pulling backwards.

Q. Then you noticed Nick's mother was out there?

A. That's when Sheila had walked outside, yes, sir.

Q. What did you hear her say?

A. Sheila was asking Sutton what was going on, and he told her that she needed to shut up and stay out of it and to get out of his face or he would mace her, too.

(Deposition of Lori Bryan, pp. 41-52).  At this point, no one had been maced.

Just after arriving on the scene, Sutton called for back-up.  Officers C.H. Davis and E.J. Fann arrived within a few minutes.  Two other officers, Leon Rowan and Mark Kanady, also responded to the call for back-up.  At the scene, Sutton repeatedly threatened to use mace, and Davis threatened to "beat their ass."  At one point, the video clearly shows Nicholas jump or lunge toward the officers in a threatening manner.

An off-duty sheriff's deputy, Chuck Underwood, was inside the salon using a tanning bed when the traffic stop commenced.  Underwood also came into the parking lot, and told Sutton he was a deputy.  Sutton told Underwood to either help out or "get the fuck out of my way."  Nicholas

approached the officers again, making threatening lunging motions toward them and talking. Underwood advised Nicholas to do what the officers told him to do.

In response to orders to go to the hood of the patrol vehicle, Nicholas eventually walked to the vehicle and put his hands on the hood. Sutton attempted to put handcuffs on him. Nicholas is approximately 6'4" tall and weighs about 360 pounds. Officer Sutton was able to get the cuffs around one arm, but had trouble securing the other arm, and Rowan assisted Sutton in taking control of Nicholas's arms. Nicholas told the officers that they would need two sets of handcuffs because of his size. Before the cuffs were secured, however, a scuffle took place. The video clearly shows Nicholas's right are still unsecured and free. The officers forced Nicholas's head onto the hood of the police vehicle.

At this point, the video is of little assistance because Nicholas and the officers are largely out of the view of the camera. The officers were able to secure the cuffs, and Nicholas remained with his head down on Sutton's patrol vehicle. After he was handcuffed, Sutton sprayed mace into his face from a distance of 2½ to 3 feet.[4]   Nicholas described the events this way:

Q. What happened at that point?

A. I believe he got on his radio somewhere in there, and it wasn't long more officers was up. Like I said, then I come to the hood of — come up to the hood of his truck. By about that time, Chuck comes out, assesses the situation, he says he's going to put me in cuffs, and Chuck says, do what he says to do, comply with what he's doing.
     So I let him put me in cuffs, and I told him, you have to put me in two sets of cuffs. He puts me on two sets of cuffs, pushes me down on the hood, and then it wasn't too long after that he — they take me around to the driver's side of his truck, pushes me down on the truck, and then Sutton maced me. Still, to this day, I have

_____

[4]      Officer Sutton has testified that the mace was sprayed before the cuffs were fastened and while he was resisting.

no apparent reason why. I was already in cuffs, so why did I need to be maced for after that, I don't know.

(Deposition of Nicholas Bryan, pp. 54-55).

Nicholas then told Officer Davis, "if you wasn't behind that badge and you think you can do it with the stick down, take your badge off and uniform off and let's see how we can handle this." A few minutes later, officers gave Nicholas's mother permission to rinse his eyes and face with water, which she did.

Soon after Nicholas's eyes were rinsed, Lori approached the scene.  Officer Davis remarked that Nicholas had threatened him, but Lori responded that no one had threatened Davis.  The video shows Lori throw up her arm and take several brisk steps toward Davis and Nicholas.  At that point, Officer Fann stepped forward to block her path.  He touched Lori's arm, they scuffled, and Fann pulled or pushed her to the ground.[5]  Fann went down when she did, and his knee landed on her back for a second or two.  Lori hurt her arm, and had the breath knocked out of her.  When Nicholas saw his wife go down, he stepped toward her, prompting Officer Davis pushed him back to the hood of the vehicle.  In that struggle, the video shows Nicholas grabbing Davis's baton, which Davis jerked away and then drew back threateningly, but he did not strike Nicholas.[6]  Shortly afterward, the

---

[5]     Fann and other officers have testified that Mrs. Bryan kicked Fann and was the aggressor.  They describe her "takedown" as a fall.  It is difficult to tell from the video exactly what transpired, although it is clear that Mrs. Bryan was advancing toward her handcuffed husband and the officer who was standing beside him at the patrol vehicle.  It also is clear that Fann moved into her path and attempted to prevent her from getting any closer to the patrol vehicle.

[6]     The plaintiffs make much of their contention that Davis drew his baton, yelled, and cursed at the plaintiffs and other onlookers.  The plaintiffs do not allege that Davis ever hit either plaintiff with the baton, or otherwise inflicted any injury.  The court finds no legal support for the argument that yelling, cursing, and brandishing a baton constitute excessive force.

officers put Nicholas into the back of one of the police cars.  Lori eventually stood up and went to the back of the pickup truck.

Officers called paramedics, who examined Mrs. Bryan, but she did not request any treatment. Both Mr. and Mrs. Bryan were taken to the police station and were charged with resisting arrest and obstructing governmental operations, but were released after being booked.  Lori later was acquitted of both charges; Nicholas was acquitted of resisting arrest, but was convicted after a jury trial on the charge of obstructing governmental operations.

## DISCUSSION

### I. § 1983 Claims

Plaintiffs' claims in Counts I and II, alleging the use of excessive force by the defendants in effecting the arrests, arise under 42 U.S.C. § 1983, which provides a right of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" when the deprivation is caused by anyone acting under color of law.  Id.  The Fourth Amendment protects citizens from "unreasonable" seizures, which includes prohibiting the use of unreasonable force in effecting a lawful and legitimate seizure, such as an arrest.  Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989); Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."). The court of appeals has explained its Fourth Amendment excessive force principles as follows:

The Supreme Court has instructed that "all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396, 109 S. Ct. 1865. To determine whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. See id.; Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985); Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. 1865.

Therefore, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396, 109 S. Ct. 1865). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S. Ct. 1865. The reasonableness inquiry is also an objective one. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S. Ct. 1865. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. at 397, 109 S. Ct. 1865; see Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978). Furthermore, this Court has concluded that "Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive," that "[t]he hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test," and "[t]he test requires weighing of all the circumstances." Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).

Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000); see also Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11th Cir. 2005), cert. denied, 547 U.S. 1112, 126 S. Ct. 1914, 164 L. Ed. 2d 664 (2006).

Although the court has recited the evidence in a light most favorable to the non-moving plaintiffs, the legal "reasonableness" of the force used must be viewed from the perspective of the officer on the scene. Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000); Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11th Cir. 2005). The test is the "objective reasonableness" of the force used by the officer, regardless of his subjective motive or animus, taking into account the often split-second nature of the decisions officers must make about the use of force. The assessment of "reasonableness" entails careful consideration of a number of factors. For example:

> The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." [Graham], 109 S. Ct. at 1872. See also, e.g., Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986) (holding that, in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted). Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.

Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002).

A different situation exists when an arrest is made without probable cause or arguable probable cause. Where the arrest is made without even arguable probable cause, *any* degree of force may be unlawful. Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998). However, so long as an

officer has probable cause "to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender. Lee, 284 F.3d at 1194-95, quoting Atwater v. City of Lago Vista, 532 U.S. 318, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001). Both the Supreme Court and the Eleventh Circuit Court of Appeals have noted that an officer's right to effect a lawful arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof." Lee, 284 F.3d at 1200, quoting Graham, 490 U.S. at 396. It follows that, where the force applied and the injury inflicted are minimal, an excessive-force claim must fail. See Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000)(holding that application of *de minimis* force, without more, will not support a claim of excessive force).

Turning first to Nicholas's claim, it cannot now be disputed that Officer Sutton had probable cause to effect Nicholas's arrest. Nicholas has been convicted of the misdemeanor of interfering with governmental operations. That conviction now estops him from asserting that no probable cause to arrest him existed. See Wood v. Kesler, 323 F.3d 872, 879 (11th Cir. 2003); Brown v. City of Hialeah, 30 F.3d 1433, 1437 (11th Cir. 1994). Because the legality of the arrest itself cannot be challenged, essentially, Nicholas asserts that the degree of force used against him in making the arrest was excessive. On the other hand, Lori asserts both that she was unlawfully arrested and, therefore, that the use of any degree of force against her was excessive and unlawful.[7] The individual

---

[7]    Even if Mrs. Bryan's complaint could be construed to allege that she was lawfully arrested, but still was subjected to excessive force, the court would find that the force applied and the injury inflicted were so minimal as to defeat her claim. The force Mrs. Bryan complains of is Fann's "takedown," resulting in having the breath knocked out of her and scraping her arm. In Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000), the arrestee was grabbed, thrown against a van, and kneed in the back. His head was then pushed against the van, the officer searched the plaintiff's groin area in an uncomfortable manner and handcuffed him. He suffered bruises and discomfort, but the

defendants seek summary judgment on the excessive force claims, asking that the claims against them in both their official and individual capacities be dismissed.

### A.  Official-Capacity Claims

The claims against the defendant officers in their official capacity are essentially claims against their employer, the City of Gardendale.  See Will v. Michigan Department of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989)("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and, "[a]s such, it is no different from a suit against the State itself."); Cooper v. Dillon, 403 F.3d 1208, 1221 n. 8 (11th Cir. 2005); Simmons v. Conger, 86 F.3d 1080 (11th Cir. 1996).  It is clear that under Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985), official capacity lawsuits are "only another way of pleading an action against the entity."  In this case, the City of Gardendale also is a defendant, and the claims against the defendant officers in their official capacity are duplicative.  Any relief plaintiffs seek against any officer in his official capacity may be obtained through their claims against the defendant city.  Accordingly, the motion for summary judgment on claims against the defendant officers in their official capacities is due to be granted and all such claims are due to be dismissed.

---

bruises disappeared quickly and he did not require medical treatment.  207 F.3d at 1255.  The court of appeals determined that this was de minimis force, not sufficiently serious to implicate the Fourth Amendment.

**B. Individual-Capacity Claims**

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights." Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" accomplished through means that are within the official's authority to utilize. Holloman v. Harland, 370 F.3d 1252, 1265-66, (11th Cir. 2004), quoting Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994). Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield. Harris v. Board of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997). Even so, qualified immunity does not apply in those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law. Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official is acting within the scope of his position lies with the defendant asserting that defense. Holloman, 370 F.3d at 1264. The test is not whether the defendants had the authority to effectuate an illegal act, but whether their jobs entailed engaging in the act in general. See 370 F.3d at 1266. In other words, the court does not ask whether

17

defendants had the right to illegally arrest the plaintiffs, or to use excessive force against the plaintiffs, but simply whether making arrests was within the general scope of the officers' duties. The answer, of course, is yes; thus, the initial burden of asserting qualified immunity is met.

Once the defendant has met that burden, as defendants in this case have, the burden shifts to the plaintiffs to show that the defendants are not entitled to qualified immunity. 370 F.3d at 1264. To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." 370 F.3d at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

### A.  Nicholas Bryan

Plaintiff asserts that Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993), demonstrates that there exists clearly established federal law that would prohibit the alleged conduct of spraying mace in the face of Nicholas Bryan after he was handcuffed.[8]  The first step in the qualified immunity analysis is to determine whether, taking the facts most favorably to the non-moving plaintiff as true, the defendants violated the plaintiff's constitutional right.  If the facts from the plaintiff's perspective establish a constitutional violation, the second step of the analysis is to

---

[8]      Although the complaint also asserts that officers used unreasonable force in that they "refused to use two sets of cuffs" and failed to "obtain[] emergency medical room treatment" for Mr. Bryan, the undisputed facts show that the officers did use two sets of cuffs, and that Mr. Bryan did not require medical treatment under the Gardendale policy because he was not sprayed from a sufficiently short distance.  Moreover, Mr. Bryan was given medical attention after his arrest. Accordingly, Mr. Bryan's excessive force claim is deemed to address the use of mace, allegedly after his handcuffs were secured.

18

determine whether federal law was so clearly established at that time as to give "fair warning" to the defendant that his conduct abridged the plaintiff's rights.

Under Nicholas's version of the facts, he was sprayed with mace by Officer Sutton *after* he had been handcuffed and was no longer resisting.  There can be little question that, if true, these facts was establish a violation of the Fourth Amendment's prohibition against "unreasonable" seizures.  When an arrestee is compliant and no longer a threat, the use of a chemical spray is unnecessary and excessive.  Post and other cases have held that the use of force after an individual is restrained can be deemed a constitutional violation.  The court considers Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), and Sheth v. Webster, 145 F.3d 1231 (11th Cir. 1998), in which non-threatening persons were injured by police effecting an arrest with unnecessary force.  See, also, Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998).  In Smith, a suspect who had initially threatened an officer with a baseball bat surrendered to a pursuing officer.  The officer then broke the suspect's arm while he lay face down being handcuffed.  Even though the initial use of force was warranted by the threatening act of the suspect, once he submitted to authority and ceased resistance, the need for the use of force and the degree of force proper under the circumstances diminished greatly.  Similarly, in Steth, an officer slammed a non-threatening female motel owner into a vending machine while arresting her without probable cause to make the arrest.  The events in these cases occurred well before the incident at bar, and therefore was clearly established in 2005, when this case arose.

Viewing the facts in the light most favorable to Mr. Bryan,[9]  the plaintiff has demonstrated

---

[9]     The defendants have offered evidence that the mace was sprayed before Mr. Bryan's other arm was restrained, and that Mr. Bryan was non-compliant at the time.  However, for purposes of the instant motion, Mr. Bryan's version of the events must be considered true.

the objective unreasonableness of the force used by Sutton after the plaintiff was handcuffed.  Mr. Bryan testified that he was handcuffed and had been pushed down over the hood of the vehicle before Sutton sprayed him with mace.  A reasonable juror could conclude that the plaintiff already was under the control of the officers and that no additional force was required to effectuate the arrest. The court is aware that circumstances must be evaluated on a case-by-case basis.  In this case, Mr. Bryan was clearly a formidable opponent at 6'4" and well over 300 pounds, and had been uncooperative and threatening.[10]  Even so, the circumstances alleged by Mr. Bryan create a genuine issue of material fact.  Accordingly, summary judgment is due to be denied as to Mr. Bryan's claim relating to the use of mace by Officer Sutton.

As to all other individual defendants, summary judgment is due to be granted.  Although fellow officers have a duty to intervene and prevent unnecessary force and harm to an arrestee by an officer making an arrest, they violate that duty only when the unnecessary force applied by the arresting officer is foreseeable.  Put another way, officers who fail to prevent another officer from causing unnecessary harm are liable for failing to prevent the harm only if they had a reasonable chance to anticipate the harm and intervene.  Quick, surprising uses of force that cannot reasonably be anticipated are beyond the ability of officers to prevent.  See Baltimore v. City of Albany, Ga., 183 Fed. Appx. 891, 897 (11th Cir. 2006); Jackson v. Sauls, 206 F.3d 1156 (11th Cir. 2000).  As the court explained in Jackson v Sauls, in the context of a fatal shooting:

---

[10]     The plaintiffs do not seem to allege, and cannot be successful in asserting, that the officers were not entitled to use any force at all in arresting Mr. Bryan.  The use of force that is in question, then, is the force allegedly applied after the handcuffs were in place.

> [I]n order for an officer to be liable for failing to stop another officer's
> unconstitutional use of deadly force, the officer must be in a position to intervene.
> See Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998) (addressing officer's
> liability in the context of failing to stop police brutality). We find that there is no
> evidence that Fields had time to prevent Pinckney's response.

Id. at 1174. The same rule applies here. Even viewing the evidence most favorably to Nicholas,

Officer Sutton was the only policeman that sprayed him with mace. Moreover, the use of mace by

Sutton appears to have been a quick, surprising act that could not have been anticipated by the other

officers present. For this reason, Officers Davis and Fann are not liable to failing to prevent Sutton's

use of mace, and they are entitled to summary judgment on this claim.


### B. Lori Bryan

Mrs. Bryan's claim of excessive force arises from the conduct of Officer Fann, whom she

alleges threw her to the ground. She claims that she was only reacting to the scene and did not

threaten any officer or resist arrest. Fann does not deny that he made contact with her and that the

contact resulted in her falling to the ground. Accordingly, viewing the facts in the light most

favorable to her, and therefore assuming that Fann intentionally threw her to the ground, this court

must determine whether his actions were objectively unreasonable.

First, the court rejects Lori's argument that there was no probable cause to arrest her and,

therefore, the use of *any* force to do so was excessive. See Thornton v. City of Macon, 132 F.3d

1395, 1400 (11th Cir. 1998) (finding that because the arrest lacked probable cause, "the officers were

not justified in using any force, and a reasonable officer thus would have recognized that the force

used was excessive" ). There was probable cause to arrest her, or at least arguable probable cause

for qualified immunity purposes.  It is clear from the videotape that Mrs. Bryan was moving forward, into the scene of her husband's arrest, at the time that Fann took action to restrain her.[11]  Her movement into the scene could reasonably have been construed by the officer as an obstruction of the governmental operation of arresting Mr. Bryan.  Her actions, then, created at least arguable probable cause for him to arrest her.  Accordingly, Fann was entitled to use some degree of force to effectuate that arrest.

Even if the arrest was lawful, the degree of force used can still be excessive under the totality of the circumstances.  The video very clearly shows that, at most, Fann took her to the ground, and this cannot be deemed excessive force.  Her only injuries were some "road rash" to her arm from hitting the pavement and having the breath knocked out of her.  The court of appeals has held:

> The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870-71, 104 L. Ed. 2d 443 (1989).  Nonetheless, this court recognizes "that the typical arrest involves some force and injury."  Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002).  In excessive force cases, an officer will be entitled to qualified immunity "if an objectively reasonable officer in the same situation could have believed that the force used was not excessive."  Vinyard, 311 F.3d at 1346.  "[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000).

---

[11]     To the extent that Mrs. Bryan claims she was doing nothing that could have justified her arrest at the time that Fann took her to the ground, her testimony is "blatantly contradicted" by the videotape.  While it is true that her purpose may have been only to give the truck title to Officer Davis, or to otherwise be only helpful, a reasonable officer could have believed that she was committing the offense of interfering with governmental operations, or that she posed a threat by moving toward the officers who had just arrested her husband.

Hawthorne v. Sheriff of Broward County, ___ F. 3d ___, ___, 2007 WL 5809 *3 (11th Cir. 2007).

In Sullivan v. City of Pembroke Pines, 161 Fed. Appx. 906 (11th Cir. 2006), the Eleventh Circuit Court of Appeals found a very similar set of facts to be no more than *de minimis* force.  There, a woman was arrested, and the officer "pulled her arms behind her back, forced her to the ground, placed his knee on her back, and handcuffed her." Id. at 910.  Nevertheless, the court held that "this is a '*de minimis*' amount of force in effectuating a valid arrest." Id.

The same outcome occurs here.  Mrs. Bryan was lawfully arrested when she advanced several steps in the direction where officers were arresting her husband.  Fann acted properly to restrain her.  Pulling or pushing her to ground and momentarily placing his knee in her back was mere *de minimis* force that cannot support a claim for excessive force in violation of the Fourth Amendment.   Accordingly, Fann is entitled to qualified immunity on this claim, and the motion for summary judgment as to Fann and all other defendants[12] is due to be granted.


**B.  Liability of the Municipality**

It is well-settled that a municipality cannot be liable for a constitutional tort under § 1983 unless the deprivation of the constitutional right occurred as a result of an official policy or custom of the governmental body.  See Monell v. Department of Social Services of New York, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).  Moreover, "a municipality cannot be

---

[12]        As to both of the other individual defendants, it also is due to be granted, because Mrs. Bryan does not allege that any other officer used any force to effectuate her arrest. Additionally, because Fann did not use excessive force to arrest her, the City of Gardendale also is not liable on the claim.

held liable under § 1983 on a *respondeat superior* theory." Id. at 691.  The Eleventh Circuit Court of Appeals has further determined that a municipality may be liable under § 1983 for the actions of a police officer only when the city's "official policy" caused the violation.  Gold v. City of Miami, 151 F.3d 1346, 1350 (11ᵗʰ Cir. 1998).

In order to survive summary judgment on the § 1983 claims, the plaintiffs must have come forward with evidence to show that the City had a policy of unlawfully or illegally arresting suspects or of applying excessive force.  It is here that plaintiffs have failed to offer any evidence to support such a claim.  They have also failed to show any deliberate indifference on the part of the City with respect to need for training or supervision of its officers.  There simply is no evidence that City did or failed to do anything causally related to the incident involving these plaintiffs, and it appears that their claim is grounded simply on a theory of vicarious liability.  For this reason, defendants' motion for summary judgment on the § 1983 claims of excessive force against the City are due to be granted.

## II. State-Law Claims

Plaintiffs also assert that they were arrested, imprisoned, and assaulted, all in violation of state law.  Plaintiffs further allege that the defendants' conduct constitutes the tort of outrage.[13]  The

---

[13]      The claim phrased as one for intentional infliction of emotional distress will not be discussed at length, although the motion for summary judgment on that claim is due to be granted. Under Alabama law, it is clear that the conduct alleged here cannot state a viable claim for the tort of outrage.  The tort was first recognized by the Alabama courts in American Road Service Company v. Inmon, 394 So. 2d 361 (Ala. 1980).  Since then, the Alabama Supreme Court has repeatedly made clear that a remedy is reserved for only the most egregious conduct, conduct that is both "extreme" and "outrageous" and that goes "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society."  See, e.g., Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993); Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1042, 1044 (Ala. 1993).  Not

defendants assert that they are shielded from liability for all state-law claims on the basis of discretionary function immunity under Alabama law.

According to Alabama Code § 6-5-338(a), a police officer of any municipality in the state "shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Id. Discretionary functions have been deemed to be "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take, and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Moore v. Adams, 754 So. 2d 630, 632 (Ala. 1999), citing Wright v. Wynn, 682 So. 2d 1, 2 (Ala. 1996), and L.S.B. v. Howard, 659 So. 2d 43 (Ala. 1995).

The Alabama Supreme Court specifically held that the immunity applies to the conduct of officers in the effectuation of an arrest. See Ex parte City of Montgomery, 758 So. 2d 565, 570 (Ala. 1999). In Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), the state supreme court set out a detailed test for determining when a state employee is entitled to immunity under § 6-5-338, and changed the focus of such immunity from whether the employee is engaged in a "discretionary function," to the specific provisions of the immunity articulated in Cranman. That restatement of state-agent immunity includes the provision that a state employee is entitled to immunity when "exercising

_____

only must the conduct that prompts an outrage claim be deemed egregious, the emotional distress that results also must be so extreme that "no reasonable person could be expected to endure it." Potts v. Hayes,771 So. 2d 462, 465 (Ala. 2000). There is no basis for a finding that the defendants' conduct during the arrests of Mr. and Mrs. Bryan was "extreme" or "outrageous," nor is there any evidence that supports a conclusion that either plaintiff suffered the type of severe emotional distress that would constitute a claim for relief under this legal theory.

judgment in the enforcement of the criminal laws of the state, including, but not limited to, law enforcement officers' arresting or attempting to arrest persons." 792 So. 2d at 205.  Since Cranman, a peace officer's entitlement to immunity under § 6-5-338(a) is judged by the principles set forth in Cranman, and not under an analysis of discretionary versus ministerial functions.[14]  Ex parte City of Tuskegee, 932 So. 2d 895, 904 (Ala. 2005).  The statutory immunity extends not only to the officers, but to the governmental unit that employs them.  See, e.g., Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003);  Montgomery v. City of Montgomery, 732 So. 2d 305 (Ala. Civ. App. 1999)(holding that both the officer and the city were immune under § 6-5-338 for mistaken arrest of man).

The immunity shields the officers and the city from liability "unless [the] actions were conducted with willful or malicious intent or in bad faith."  Ex parte City of Montgomery, 758 So. 2d at 570.  Accordingly, the court evaluates a claim of discretionary function immunity by first determining whether the defendant has demonstrated that he was exercising judgment in arresting or attempting to arrest the plaintiffs when the alleged wrongful conduct occurred.  If so, the burden shifts to the plaintiff to prove that the defendant acted in "bad faith, with malice or willfulness." Wood v. Kesler, 323 F.3d 872, 883 (11th Cir. 2003).[15]

---

[14]        It should be noted, however, that even before Cranman, the state courts recognized that discretionary functions were akin to those that required the exercise of judgment.  Ex parte City of Tuskegee, 932 So. 2d at 905, citing Ex parte City of Montgomery, 758 So. 2d at 569.

[15]        It has been noted that discretionary function immunity and qualified immunity both involve a "core issue" of whether a defendant violated clearly established law.  Qualified immunity, however, cannot be defeated by a showing of bad faith, malice, or wilfulness.  Scarbrough v. Myles, 245 F.3d 1299, 1303 n.9 (11th Cir. 2001).

Plaintiffs argue that defendants were motivated by bad faith, malice, or willfulness.[16]  The plaintiffs allege that Sutton arrived on the scene ranting, raving, and cursing, and that Davis threatened to beat the plaintiffs and the onlookers.  For all the reasons discussed in this court's analysis of qualified immunity, the conduct of spraying Mr. Bryan with mace after he was handcuffed — accepting the plaintiffs' version of the facts as true — could be viewed as unjustified.  Because the plaintiffs also present evidence that Sutton arrived on the scene in an angry and belligerent mood, they have at least posed a question of fact regarding malice that is due to be addressed by the jury.  However,  because the plaintiffs have failed to provide substantial evidence that could prove that Fann used excessive force in restraining Mrs. Bryan, a jury could not infer from the evidence that he acted with malice.  Accordingly, defendant Sutton is not shielded by Alabama's discretionary immunity statute as to Mr. Bryan's state-law claims of assault and battery.

To the extent that the complaint asserts false arrest and false imprisonment claims on behalf of Mr. Bryan, however, those claims are due to be dismissed on the basis that he has been convicted of criminal conduct in connection with the incident, and it is undisputed that the officers had probable cause to arrest and detain him.

As to defendant Davis, the motion for summary judgment on all state-law claims is due to be granted.  The plaintiffs have not provided substantial evidence that Davis committed any assault or battery, or that he was liable for any alleged false arrest or imprisonment.  As to defendant Fann,

---

[16]     It is conceivable that the municipal defendant could be liable for torts of its employees pursuant to Alabama Code § 11-47-90 if the conduct was the result of "neglect, carelessness, or unskillfulness."  In this case, however, there is no allegation that plaintiffs' arrests were due to neglect or a lack of skill or care.  Plaintiffs allege that the excessive force was motivated by Sutton's malice or willfulness, and not the result of neglect, carelessness, or unskillfulness.

the motion for summary judgment on all state-law claims also is due to be granted because there is no evidence that he acted with any malice or bad faith in his dealings with either plaintiff.  Finally, the defendant City of Gardendale is entitled to the same immunity as Davis and Fann for their actions, and the motion for summary judgment on Mrs. Bryan's state-law claims against the city also is due to be granted.  Likewise, because Nicholas alleges that Sutton acted intentionally, not negligently, when he sprayed Nicholas with mace, the City of Gardendale is entitled to summary judgment.  Although a municipality may be vicariously liable for the negligent "unskillfulness" of its employees, it is not liable for their intentional misconduct.  Todd v. Kelley, 783 So. 2d 31, 42 (Ala.Civ.App., 2000) ("Section 11-47-190, Ala.Code 1975, provides for an action against a municipality for the 'neglect, carelessness, or unskillfulness' of its agents, not for their intentional torts"); Couch v. City of Sheffield, 708 So. 2d 144, 154 (Ala. 1998).

## CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, the court finds that the motion for summary judgment (court document #19) filed by the defendants is due to be granted in part and denied in part.  As to Mr. Bryan's claims, the motion is due to be granted as to all claims against all defendants, except the § 1983 claim of excessive force and the state-law claim for assault and battery against Officer Sutton.  As to Mrs. Bryan's claims, the motion is due to be granted as to all claims and all defendants.

A separate order will be entered in accordance with the findings set forth herein.

DATED this 28th  day of September, 2007.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE